**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

AMERICAN VERIFICATION PROCESSING SOLUTIONS, LLC

    Plaintiff,

v.

ELECTRONIC PAYMENT SYSTEMS, LLC; and ESQUIRE MERCHANT SERVICES, LLC

    Defendants.

**COMPLAINT AND JURY DEMAND**

Plaintiff American Verification Processing Solutions, LLC ("AVPS"), by and through counsel Daniel R. McCune, Scott A. Neckers, and Richard L. Merpi II of CHILDS MCCUNE LLC, hereby submits the following Complaint and Jury Demand:

**Parties, Jurisdiction, and Venue**

1. This Honorable Court has jurisdiction as this is a diversity action filed under the provisions of 28 U.S.C. § 1332 by reason of the complete diversity of the citizenship of the parties and that the amount in controversy without interest and costs exceeds $75,000.

2. Plaintiff, American Verification Processing Solutions, LLC ("AVPS") is a California limited liability company and has its principal place of business at 21515 Vanowen St #114, Canoga Park, CA 91303.

3. AVPS is a merchant account provider who supplies point of sale equipment, gateway services, and other products that enable merchants to process credit card sales

transactions. AVPS from time to time also contracts with credit card payment processing companies to act as an outside sales organization, referring merchants to those credit card processors for a fee.

4. Defendant Electronic Payment Systems, LLC ("EPS") is a Colorado limited liability company and has its principal place of business at 6472 S Quebec St, Centennial, CO 80111.

5. Defendant Esquire Merchant Services LLC ("ESQMS") is a Colorado limited liability company and has its principal place of business at 6472 S Quebec St, Centennial, CO 80111. ESQMS was deemed to be a delinquent company with the Colorado Secretary of State as of March 1, 2017.

6. EPS is an independent sales organization ("ISO") and payment processor. Among other things, EPS markets payment processing services to merchants and arranges for merchants to obtain "merchant accounts" through which merchants can process credit card sales transactions. Using the services of payment processors, EPS processes credit card payments for merchants through EPS's acquirer. EPS transacts or has transacted business in this district and throughout the United States.

7. EPS and ESQMS both have their principal place of business at the same address: 6472 S Quebec St, Centennial, CO 80111. EPS and ESQMS are operated by the same individuals, including John Dorsey and Anthony Maley. John Dorsey is the registered agent of EPS. Anthony Maley is the registered agent of ESQMS, and John Dorsey is the person who formed ESQMS. Defendants EPS and ESQMS are controlled and owned by the same principals, and are often referred to interchangeably as the same company.

8. Venue is appropriate under 28 U.S.C. § 1391(b)(1), as the Defendants have their principal place of business in Colorado, and jurisdiction is proper in the U.S. District Court for the District of Colorado pursuant to the Court's diversity jurisdiction and the contracts between the parties.

### General Allegations

9. Plaintiff incorporates by reference paragraphs 1 through 8 herein by reference.

10. In 2014, AVPS representatives began negotiations with EPS representatives John Dorsey and Anthony Maley to form a business relationship where AVPS would market and sell EPS' credit card payment processing services to merchants and then refer those merchants to EPS to become clients/customers.

11. On October 6, 2014, John Dorsey and Anthony Maley filed Articles of Organization to form ESQMS. Upon information and belief, Dorsey and Maley formed ESQMS for the purpose of entering into a merchant referral contract with AVPS.

12. On or about December 31, 2014 AVPS and ESQMS entered into an agreement, wherein AVPS would market and sell Processing Services by soliciting merchants and referring them to ESQMS to become clients/customers.

13. The 2014 agreement provided for compensation to AVPS from ESQMS, based on a percentage of the credit card processing fees charged on transactions performed by merchants whom AVPS referred to ESQMS for Processing Services.

14. Although ESQMS was the named party to the agreement, at all times the parties understood that the agreement between AVPS and ESQMS was for the benefit of EPS and that AVPS was actually referring merchants to EPS for credit card processing services.

15. At all times, EPS performed all of the duties and obligations of ESQMS under the terms of the agreement, including paying AVPS the fees that AVPS earned on the sale transactions executed by merchants they referred to EPS.

16. AVPS also had its own unrelated customers for its own credit card processing services and products. EPS did not have any involvement in AVPS' unrelated business.

17. In 2015, EPS wanted to modify the parties' relationship to include a reciprocal referral arrangement through which EPS would be able to earn fees for any merchants that EPS referred to AVPS for credit card processing services.

18. On or about September 4, 2015, EPS' chief operating officer, Anthony Maley, emailed AVPS' vice president of operations, Natasha Beswick, in order to put together a reciprocal universal agreement covering the flow of business in both directions.

19. As a result of that communication, AVPS and EPS entered into two Merchant Referral Agreements. One redefined the rights, responsibilities, and payment associated with AVPS bringing customers to EPS for processing services. The other defined the rights, responsibilities, and payment associated with EPS bringing customers to AVPS for processing services.

20. On September 25, 2015, the parties finalized these two agreements with signatures from Tiffany Segura, AVPS' managing member, and John Dorsey, EPS' President and CEO.

21. The 2015 Merchant Referral Agreement governing AVPS' agreement to refer merchants to EPS specifically stated that it "shall supersede and cancel all prior offers, negotiations and agreements . . . ."

22. Regarding the Merchant Referral Agreement where AVPS referred merchants to EPS to conduct processing, AVPS is entitled to sixty-five percent (65%) of Net Profits ("the total of all merchant discount amounts and merchant discount rate collected by EPS from referred and approved merchants each month pursuant to EPS' agreement with such merchants, less ACH rejects, chargebacks, and expenses incurred by EPS") each month.

23. Under the 2015 "Merchant Referral Agreement" EPS is required to pay compensation to AVPS on all referred merchant accounts for the life of their processing with EPS unless EPS terminates the Agreement for cause based on material breach, fraud, negligence, or illegal activity by AVPS so as to justify the immediate cessation of referral fees.

24. This 2015 Merchant Referral Agreement requires EPS to pay compensation to AVPS on all referred merchant accounts for the life of their processing with EPS unless EPS terminates the agreement for cause based on material breach, fraud, negligence, or illegal activity by AVPS so as to justify the immediate cessation of referral fees.

25. AVPS enrolled approximately 220 merchants/accounts with EPS pursuant to the parties' agreement.

26. For a merchant to be able to accept credit card payments for goods and services, credit card processing services are only one piece of the transaction. Merchants need point of sale equipment for in-store purchases and gateway services for online purchases, among other things.

27. Gateway services enable an online merchant to accept a credit card payment, which payment is then sent to a payment processor for confirmation, who then sends the information to the customer's financial institution to actually be charged to the card used for the payment.

28. Below is a helpful illustration of the way online credit card sales and payment are accomplished:



Chang, Jenny. *Payment Gateway v. Processor: What is the Difference?*, FinancesOnline: Reviews for Business, https://financesonline.com/payment-gateway-processor-difference/

29. In order to ensure that the approximately 220 merchants AVPS referred to EPS for payment processing services also had gateway services and other services to enable them to accomplish credit card transactions, particularly online, AVPS directly entered into agreements with many of those merchants under which AVPS provided gateway services to the merchants. Depending on the agreement, AVPS also provided customizable reporting services, mobile device transaction services, and customer vault services for securely storing customer payment information.

30. EPS did not provide any of these services to any of the merchants in question, nor did the agreements in question prohibit AVPS from providing these services to the merchants.

31. Pursuant to AVPS' agreements directly with the merchants, AVPS received monthly gateway services fees, gateway transaction fees, mobile device fees, reporting fees, and customer vault fees.

32. Though AVPS referred a total of approximately 220 merchants over the course of the parties' relationship, as of November 2016, AVPS had a portfolio of 90 active merchant accounts with EPS, generating over $50,000 per month in residual fee compensation to AVPS.

33. On Tuesday, November 22, 2016, EPS wrote to AVPS regarding alleged billing irregularities by AVPS in connection with one of its merchants, CW Botanicals ("CWB"). EPS provided AVPS with a copy of CWB's October 2016 bank statement, reflecting a series of highlighted charges by AVPS, and asked AVPS to explain the charges, and provide a copy of any corresponding grant of permission, by Monday, November 28, 2016.

34. On Wednesday, November 23, 2016, AVPS wrote to EPS to explain that the highlighted entries reflected charges for gateway services provided to CWB by AVPS pursuant to an independent contract between AVPS and CWB.

35. On Monday, November 28, 2016, EPS requested the billing for all services provided directly by AVPS to merchants AVPS has referred for processing services to EPS. EPS also asked AVPS to substantiate the charges appearing on CWB's October 2016 bank statement. AVPS responded that same day by providing EPS with a Gateway Fee Addendum for each of the other merchants who received processing services from EPS and were also receiving gateway

services from AVPS, along with a billing report for October 2016, breaking down all charges by AVPS to CWB and each of those merchants for gateway services.

36. On Tuesday, November 29, 2016, EPS acknowledged AVPS' production of the requested materials, and for the first time indicated that it was looking into billing anomalies brought to its attention by CWB in connection with "Over the Limit" charges by AVPS. EPS claimed that AVPS had breached the parties' agreement and violated Card Brand Rules by charging merchants for services outside the merchants' agreements with EPS. The parties agreed to hold a conference call on Friday, December 2, 2016 to address EPS' stated concerns.

37. On Wednesday, November 30, EPS sent AVPS an email excerpting claims by CWB that AVPS had debited CWB's bank account for "Over Limit Fees." That same day, EPS sent AVPS a Notice to Cease and Desist "all activities associated with the billing and service offerings outside of the EPS 'Processing Service' and 'Merchant Application and Processing Agreement' to accounts" solicited through AVPS' association with EPS. EPS alleged that AVPS' conduct constituted unauthorized account access, possible theft and fraud, contractual interference, consumer fraud, violation of Card Brand Rules, and breach of contract.

38. On Friday, December 2, 2016, the parties held the scheduled conference call between Chief Operating Officer Anthony S. Maley of EPS and President Tiffany Segura, Vice President of Operations Natasha Beswick, and in-house counsel Jennifer S. Vaughan of AVPS. During that call, AVPS explained that AVPS only bills EPS merchants for customer services, such as gateway services, provided to them pursuant to a direct contractual relationship that is separate and distinct from the contractual relationship between those merchants and EPS.

39. During this call, Mr. Maley promised that if AVPS "fixed the problem" with CWB and only billed EPS merchants for services provided by AVPS pursuant to such direct contracts, EPS would reinstate its referral relationship with AVPS. Based on this understanding, AVPS agreed to reimburse CWB for the full amount of the disputed "Over Limit Fees."

40. On Monday, December 5, 2016, AVPS contacted CWB to request a summary of the disputed charges. On Friday, December 9, 2016, CWB responded by requesting a deposit of $264,524.69 into its bank account at Champion Bank by the close of business on December 16, 2016 to reimburse erroneously billed charges for the period of June 2015 through May 2016.

41. On Monday, December 12, 2016, AVPS confirmed that it would honor CWB's request and return the full amount requested to CWB. AVPS initiated a wire the following day. On Friday, December 16, 2016, CWB sent AVPS an email, confirming its receipt of the deposit in full and final satisfaction of the disputed amount.

42. On December 28, 2016, having fully and finally resolved the CWB billing dispute, AVPS wrote to EPS to request payment of its October and November residuals and confirm the resumption of the merchant referral relationship with EPS, consistent with the parties' agreement during the December 2, 2016 telephone conference.

43. On December 29, 2016, EPS abandoned the promises Anthony Maley made to AVPS during the December 2, 2016 telephone conference. EPS reversed course and now demanded that AVPS pay EPS for all revenue AVPS received above and beyond the "pass through" for any specific service supplied by AVPS to the referred merchants outside of the services the referred merchants received pursuant to their contractual relationships with EPS. EPS

also reiterated its previous assertion that AVPS had engaged in conduct amounting to an "immediate termination breach," but claimed that EPS had not yet fully determined its next action.

44. EPS' actions were a transparent attempt to pressure AVPS to share gateway and other service fees earned by AVPS pursuant to its own independent contractual relationships with EPS merchants to which EPS had no rights or interest under the parties' agreements. The threat was clear: give us a cut of your gateway services deals or we will terminate you. EPS also took this action in direct contravention of the December 2, 2016 agreement, which resolved all outstanding issues through the payment by AVPS to CWB in the amount of $264,524.69.

45. AVPS responded on December 29, 2016 by pointing out that each of EPS' contentions were in direct conflict with Mr. Maley's representations to AVPS during the December 2, 2016 telephone conference and contravened the spirit and substance of the understanding reached between EPS and AVPS that day. AVPS also emphasized that, while EPS has an express contractual duty to compensate AVPS for all income generated on merchants referred by AVPS to EPS, nothing obligates AVPS to pay income to EPS related to those same merchants. AVPS put EPS on notice that its conduct in refusing to report and continuing to withhold AVPS' residuals constituted a material breach of EPS' obligations under the Agreement.

46. On January 6, 2017, EPS responded by asserting that "the Agreements" do not allow AVPS to charge merchants outside of "the Agreements." As such, EPS reiterated its request for an accounting of all fees charged to EPS merchants that AVPS or a service provider acting for or on behalf of AVPS had charged.

47. On January 13, AVPS responded by making clear that EPS has no right to participate in AVPS' income for gateway services. Instead, AVPS has the right to use any

equipment or gateway provider it chooses, and retain the residuals for such billings, as is customary for referral sales agents in the merchant processing industry.

48. EPS did not offer any response, stopped communicating with AVPS, terminated AVPS' access to EPS' systems, and failed to make any further residual payments to AVPS for the period of October 2016 onward.

49. As of October 2019, EPS has not made any residual payments to AVPS for merchants referred by AVPS since October 19, 2016.

## First Claim for Relief
### (Breach of Contract)

50. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 49 of this Complaint, as if set forth verbatim.

51. Plaintiff and Defendants entered into the Agreement described more fully above, and the Agreement constitutes a binding contract.

52. The Agreement requires Defendants to compensate Plaintiff by paying fees to Plaintiff under the Agreement for merchants, customers, and businesses Plaintiff referred to Defendants for credit card processing services and products.

53. Plaintiff has fully performed or tendered all performance required under the Agreement.

54. EPS failed to perform its obligations under the Agreement starting on November 22, 2016 and continuing through present by failing to compensate Plaintiff under the Agreement.

55. Defendants' material breach in failing to compensate AVPS in accordance with the terms of the Agreement damaged Plaintiff in an amount exceeding $75,000.

## Second Claim for Relief
### (Unjust Enrichment - EPS)

56. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 55 of this Complaint, as if set forth verbatim.

57. Defendant EPS received a benefit in the form of monies received for payment processing fees on merchant transactions completed by merchants whom AVPS referred to EPS.

58. Defendant EPS received these fees at the expense of AVPS and without paying AVPS any fee for its referral of those merchants.

59. It would be unjust for Defendants to retain the full payment processing fees for merchants AVPS referred to EPS without compensating AVPS for obtaining and referring those merchants, as more specifically alleged above and throughout this Complaint.

60. Defendant EPS' unjust enrichment has damaged Plaintiff in an amount exceeding $75,000.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully prays for compensatory damages in its favor and against Defendants in an amount to be determined by the trier of fact, interest from the date of filing, pre-judgment and post-judgment interest as allowed by law, witness fees, filing fees, deposition expenses, attorney's fees, and for such other and further relief as the Court may deem appropriate and just including costs.

## Jury Demand

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted this 11th day of October, 2019.

                *s/ Scott A. Neckers*
                Scott A. Neckers
                Daniel R. McCune
                Richard Merpi
                Childs McCune LLC
                821 17th St., Ste. 500
                Denver, Colorado   80202
                303-296-7300 – Telephone
                720-625-3637 – Facsimile
                sneckers@childsmccune.com
                dmccune@childsmccune.com
                rmerpi@childsmccune.com
                *Attorneys for Plaintiff*
                *American Verification Processing Solutions, LLC*

**Plaintiff's Address:**
21515 Vanowen St #114, Canoga Park, CA 91303.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing COMPLAINT AND JURY DEMAND was filed with the Clerk of the Court using the CM/ECF system this 11th day of October 2019.

*s/ Sheila A. Morse*
Sheila A. Morse